UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:24-cr-31(1) |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | |
| KEVIN DERAMUS, a/k/a "K-Bone," | : | |
| Defendant. | : | |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Kevin Deramus is a killer. He ran his drug trafficking enterprise premised on that fact. The drugs he sold you might kill you. If you robbed his stash house, he would have you killed. And if you owed him money, he might kill you himself.

For the reasons below, the United States asks that the Court sentence Deramus to the very top of his guidelines: 327 months in prison, followed by lifetime supervised release.

### FACTS[1]

For years, Kevin Deramus was one of Cincinnati Police Department (CPD)'s "most wanted" targets based on his suspected role as a large-scale fentanyl source-of-supply in the West End and his involvement in numerous prior homicides and murders-for-hire.

Then, in August 2023, Deramus was intercepted on a call with Quinell Hadden during an ongoing TIII wiretap investigation into Hadden and the Hadden Drug Trafficking Organization (the "Hadden DTO").[2] During that call, Deramus advised that he had something that Hadden

---

[1] The United States incorporates the facts from the Presentence Report (Doc. 115) and Plea Agreement (Doc. 87).
[2] Hadden, at the time, was intercepted complaining about the "lack of consistent" from his current source of supply (*i.e.*, members of Cartel Jalisco New Generation, who moved to town to establish operations directly with Hadden).

"might be interested in" (*i.e.*, drugs) and offered to provide Hadden with a "sample" to "test." Hadden immediately agreed to meet; and because Hadden knew Deramus and Deramus' reputation, Hadden advised that he didn't need to sample Deramus' drugs beforehand. Based on that call, agents initiated an independent, "spin-off" investigation into Deramus, his drug trafficking operations, and his involvement in numerous prior homicides. And a few months later, in January 2024, agents initiated a TIII wiretap on Deramus's phone.

Over the course of the subsequent wiretap, agents learned that Deramus purchased large quantities of heroin from co-defendant Gregory Isham. Deramus and co-defendant Dorian Freeman then cut and processed that heroin with fentanyl, cocaine, xylazine, and other drugs/cutting agents at Deramus' primary residence and stash house, 2313 Walden Glen Circle, Cincinnati, Ohio (the "Walden Glen Stash House"). Deramus then sold that heroin/fentanyl mix primarily to co-defendants: (1) Freeman, who operated out of his primary residence at 3175 Mayridge Court, Apt. #7, Cincinnati, Ohio ("Freeman's Residence") or Freeman's stash house at 1756 Queen City Ave., Cincinnati, Ohio ("Freeman's Stash House" or the "Queen City Stash House"); (2) Damien Tribble at Tribble's primary residence, 1809 Carll St., Cincinnati, Ohio ("Tribble's Residence"); and (3) Edmund Hurt at Hurt's stash house at 3078 Sidney Ave., Cincinnati, Ohio ("Hurt's Stash House"). Meanwhile, Deramus initially stored his drugs at the

---

Hadden and twelve others were later charged in case no. 1:23cr107. Hadden pled guilty and admitted, in part, that:

> [He] was the local head of a large-scale drug trafficking and money laundering organization (the "HADDEN DTO"). As such, HADDEN was primarily responsible for obtaining and distributing several hundred kilograms of fentanyl, hundreds of kilograms of cocaine, multi-kilogram quantities of methamphetamine, and voluminous amounts of other drugs … In particular, HADDEN … obtained hundreds of kilograms of fentanyl directly from members of the Sinaloa Cartel … at least approximately 45 kilograms of cocaine from members of the Cartel Jalisco New Generation (CJNG), who came and lived in Cincinnati, Ohio for several months to directly oversee operations with HADDEN … HADDEN also obtained and distributed large multi-kilogram shipments of …: (1) fentanyl and methamphetamine sent through the mail from Phoenix, Arizona …; (2) fentanyl and other precursors sent through the mail from China; and (3) fentanyl, cocaine, and other drugs from various other sources of supply.

(Hadden Plea Agreement, Doc. 246, S.D.OH. case no. 1:23-cr-107; which is incorporated herein by reference.)

Walden Glen Stash House but then later began using a storage unit at Extra Space Storage, 8100 Hamilton Ave., Cincinnati, Ohio (the "Storage Unit"); and then stored his cash at his parents' residence at 1866 Catalina Ave., Cincinnati, Ohio (the "Catalina Stash House").

On January 23, 2024, agents intercepted calls and conducted surveillance of Deramus purchasing heroin from Isham and collecting or attempting to collect cash from both Tribble and Freeman. On January 30, 2024, Deramus purchased more heroin from Isham. On January 31, 2024, Deramus drove to Tribble's Residence and sold Tribble a portion of those drugs.

On February 3, 2024, agents intercepted calls and conducted surveillance of Deramus and Freeman cutting and processing drugs for distribution at the Walden Glen Stash House. The next day, agents intercepted a call where Deramus and Freeman discussed the quality of their drugs and how they believed one of their "testers" may have overdosed because of how potent they cut them:

| Freeman | Your dude called back yet? |
| Deramus | … He keep tryna call and she ain't been answerin' the phone |
| Freeman | Oohh-wee |
| Deramus | And I told you what he did to it |
| Freeman | Oh yeah |
| Deramus | He said he put a three on it and put a half of mimi [phonetic] other juice. He been tryna call all day. He tried on 3-ways and everything. |
| Freeman | Yeah, that might be dangerous right there, boy. |
| Deramus | [Laughs] |
| Freeman | Yeah, that might be dangerous … because she my girl, she'll tell you it's that but it be, you know how it is, they tell you it's that because they don't want you to do nothin' to it. Know what I mean? … But it tooker her a long time to call me. When it take her a long time to call back, I already know what it be. |

On February 8, 2024, Deramus repeatedly tried to contact Hurt to sell Hurt more drugs (but was intercepted discussing how frustrated he was because Hurt wouldn't answer). Immediately after, Deramus drove and engaged in a hand-to-hand transaction with Tribble at Tribble's Residence. On February 10, 2024, Deramus collected drug proceeds from another customer and then drove and stored that cash at his Catalina Stash House. On February 12, 2024, Deramus was

3

intercepted bragging about how potent his drugs were, while simultaneously complaining that they were too potent as it now took his "licks" longer to come back and buy more:

| Co-Conspirator | Basically, I went to go smack my plays, bro. My shit done got slow … It ain't like slow slow but its slow like it ain't, it really like, like I been, like [unintelligible] |
|---|---|
| Deramus | No, that's cause the shit last long |
| Co-Conspirator | Oh |
| Deramus | I'm tryna tell you bruh |
| Co-Conspirator | … It got legs … They ain't gotta come right back, unc |
| Deramus | That's what I'm tellin' you |
| Co-Conspirator | My lick told me that. They got [unintelligible] |
| Deramus | That's what I'm tellin' you |
| Co-Conspirator | It's some real H [heroin] in this shit. I can tell the taste and I can tell it has them long legs. Shit, that prolyl gotta be it |
| Deramus | It is that … Everybody, everybody, my brother … he got a phone. He called me today. He say, "Bruh, you musta ran into the money man," "Hey, boy, they love that shit." … He say the only thing is, it's makin' them not come back right away. |
| Co-Conspirator | Yup. Yeah, I had some shit that was alright but it ain't had them legs on it … |
| Dearmus | You shoulda mixed it. You ain't have nothin' laying around? |
| Co-Conspirator | I'm about a do all of that. I'm bouta mix all that shit with that … otherbulshit I had got that one time. |
| Deramus | Hell yea. That's what I do. |

On February 14, 2024, Deramus engaged in several drug transactions, including a hand-to-hand with Tribble at Tribble's Residence. On February 16, 2024, Deramus met with Isham to purchase more heroin. On February 17, 2024, Deramus (again) met with Freeman to cut and process that heroin with fentanyl and other drugs at the Walden Glen Stash House. While they were inside cutting and processing those drugs, agents intercepted a call where Deramus stated, "I was in that mother fucker throwin' up … shit, I had the shirt around my face and everythin'."

On February 18, 2024, Deramus sold some more drugs to Hurt at Hurt's Stash House. Meanwhile, on both February 18 & 19, 2024, agents saw Deramus dispose of trash at his Walden Glen Stash House, conducted trash pulls, and recovered large-scale drug processing materials, covered in residue lab-confirmed as a mix of heroin, fentanyl, and xylazine.

On February 20, 2024, Deramus sold more drugs to Hurt at Hurt's Stash House. On February 21, 2024, CPD executed a search warrant at Hurt's Stash House. Inside, they found roughly 27 grams of a mix of heroin, fentanyl, cocaine, xylazine, methamphetamine, etizolam, and medetomidine; a few grams of a mix of fentanyl, cocaine, and xylazine; roughly seven grams of cocaine; and three loaded firearms. Moreover, as CPD was positioned outside, waiting to execute that warrant, Hurt arrived, saw law enforcement, fled, and later alerted Deramus that police had searched his Stash House. Yet later that same day, Deramus drove to Tribble's residence and sold Tribble more drugs. On February 22, 2024, Deramus was intercepted on calls, expressing how he should not have been "dealing" with someone who was on federal probation (Hurt) and that he (Deramus) was nervous that Hurt was going to cooperate. On February 23-24, 2024, Deramus repeatedly called and texted Hurt, demanded that he pay his outstanding drug debt and return whatever drugs he still had to Deramus (which Deramus later ended up selling to Tribble at Tribble's Residence). Deramus also texted Hurt, "I need dude['s] name so I can look him up," in reference to Joshua Cole, who shared Hurt's Stash House with Hurt and was arrested after the search warrant was executed there. Agents later found screenshots of Cole's arrest record and arrest photo on both Deramus' and Hurt's iClouds.

On March 3, 2024, agents intercepted a call between Deramus and Tribble, where they first discussed drug prices being offered by sources; then discussed Hurt and the search warrant at Hurt's stash house; followed immediately by how they planned on proceeding with trafficking drugs, regardless, even given all the recent law enforcement activity. Meanwhile, in the background, Tribble was coordinating an apparent drug deal with a third-party, wherein Tribble advised that he will be "right there" by "government square," *i.e.*, directly outside of Potter Stewart Courthouse. Tribble ended the call by stating, "He pullin' up. I'll call you back … He pulled up."

In early March 2024, agents intercepted calls indicating that Isham was about to re-up from his source-of-supply. So, on March 7, 2024, agents executed search warrants at Isham's residences. In total, agents recovered several firearms, magazines and ammunition, a bag of 12.684 grams of lab-confirmed cocaine, a bag of 284.4 grams of lab-confirmed heroin, and two bags containing a total of 1,006.3 grams of lab-confirmed heroin. Later that same day, Deramus sold more drugs to Tribble at Tribble's Residence.

On March 9, 2024, CPD "tickled the wire" about Deramus' prior homicide/murder-for-hire investigations. At 9:48 AM, CPD Homicide Detectives approached Deramus' father at the Catalina Stash House and advised that they were looking to speak with "Kevin Deramus" about a "2017 cold case homicide" involving a victim known as "T-Roc" (Troy Smith). Immediately thereafter, at 10:05 AM, agents intercepted a call between Deramus and his father, where they discussed what had just unfolded. During that call, Deramus never questioned what the CPD Homicide Detectives were talking about. At 10:38 AM, Deramus left work. Notably, this was the only time during the investigation that agents ever saw Deramus leave work early. He then drove directly to his Walden Glen Stash House for about ten minutes, departed at 11:02, and drove directly to his Storage Unit (presumably moving his drugs from the Walden Glen Stash House to his Storage Unit). He then met with his father, then his attorney, then with Freeman for several hours.

On March 10, 2024—the very next day—Deramus (again) met with Freeman to cut and process more drugs at the Walden Glen Stash House. Thereafter, Deramus drove directly to Tribble's Residence and sold some of those drugs to Tribble. In other words, in response to CPD Homicide's questions about his involvement in prior homicides, Deramus simply moved where he was storing his drugs (to his Storage Unit) and then proceeded forwarded with business as usual. Meanwhile, on March 11, 2024, CPD Homicide received an unexpected call from the mother of

6

Troy Smith, a/k/a "T-Roc," asking if there were any updates on her son's unsolved 2017 murder; specifically, if anything ever came of "Kevin Deramus" and his possible involvement.

On March 12, 2024, CPD Homicide interviewed a witness (the "Witness") about the unsolved 2017 murder of Troy Smith, a/k/a "T-Roc." The Witness left CPD Homicide at 11:13 AM. At 11:16 AM, the Witness called Deramus (who didn't answer) and then texted Deramus one minute later, "call me." Shortly thereafter, Deramus left work early again, which was only the second time agents ever saw him leave work early. Deramus drove directly to the Witness' residence and met with the Witness, inside his car, parked out front, for nearly an hour.

On March 13, 2024—the very next day—Deramus sold more drugs to Tribble at Tribble's Residence; went and met with Freeman; and then, later that night, travelled to his Storage Unit. The next morning, agents executed search warrants and arrested Deramus. On his person, he had bulk cash, two cell phones, a digital scale, various over-the-counter pills, and two baggies lab-confirmed as approximately 22.82 grams of a mix of heroin, fentanyl, xylazine, and isotonitazene. At his Catalina Stash House, agents found $290,830 of bulk cash, eleven cell phones, other electronics, a gold Rolex watch, and personal papers with Deramus' driver's license number. At his Walden Glen Stash House, agents found Deramus' wallet, credit cards, and the key to his Storage Unit. Inside his Storage Unit, agents found a digital scale; a half kilo brick, subsequently lab-confirmed as approximately 482.4 grams of a mix of heroin, fentanyl, cocaine, xylazine, and isotonitazene; and 55.993 grams of a mix of heroin, fentanyl, and xylazine.

*   *   *

Deramus, Isham, Freeman, Tribble, and Hurt were all subsequently charged in this case. (*See* Indictment, Doc. 1.) Deramus later pled guilty pursuant to a Rule 11(c)(1)(A) Plea Agreement (Doc. 87) to Count One of the Indictment for conspiracy to distribute heroin and fentanyl, in

7

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), & 846.  Under the statute, Deramus faces a ten-year mandatory-minimum term of imprisonment, up to life; at least five years of supervised release, up to life; a $10,000,000 fine; and a $100 special assessment.  As calculated in his PSR, his guidelines call for a term of imprisonment of 262-327 months.  The United States asks that the Court sentence Deramus to 327 months in prison, followed by lifetime supervised release.

## ARGUMENT

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence."  *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (cleaned up).  The "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Then, "the district court must weigh and apply the range of factors outlined in 18 U.S.C. § 3553(a)."  *Id*. at 49-50.  These include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a).  The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *Id.*

**I.     Sentencing Guidelines & Objections to PSR**

As calculated in his PSR (Doc. 115), Deramus' guidelines call for a term of imprisonment of 262-327 months.  Based on the drugs recovered from his person and his storage unit (561.213 grams of fentanyl/heroin mix) and the cash from his Catalina Stash House ($290,830), his base

8

offense level is 32.  He qualifies for the +2 enhancement for violence under U.S.S.G. § 2D1.1(b)(2) and the +2 enhancement for maintaining a stash house under U.S.S.G. § 2D1.1(b)(12). Regardless, Deramus is a "Career Offender" under U.S.S.G. § 4B1.1(a).  And because he is charged with a drug trafficking offense that carries a statutory ten-year mandatory minimum term of imprisonment and up to life, his offense level is automatically a 37 with a Criminal History Category VI. Deramus accepted responsibility and timely notified the United States of his intention to plead guilty, which lowers his total offense level by -3.  Thus, with a total offense level of 34 and a Criminal History Category VI, his recommended guidelines are 262-327 months in prison.

| ~~Guidelines~~ | | Career Offender | |
|---|---|---|---|
| ~~Base~~ | ~~32~~ | Base | 37 |
| ~~Violence~~ | ~~+2~~ | Plea | -3 |
| ~~Stash House~~ | ~~+2~~ | Total | 34 |
| ~~Plea~~ | ~~-3~~ | w Crim Hist VI = | 262-327 |

Deramus raises three objections to the PSR.  First, he claims he "did not use credible threats of violence." (PSR, Doc. 115, p. 45.)  Second, he states that he "never utilized any residences as a storage facility/unit or stash house." Third, he objects to several specific prior convictions, which he believes should not be assessed any criminal history points. (*Id*.) The United States will be address these objections, in detail, if necessary, at the sentencing hearing.  But for the reasons explained above, in the United States' Response (*id*., p. 47-49), and in Probation's Addendum (*id*., p. 50-52), all three of Deramus' objections are meritless and should be overruled by the Court.

II.     ANALYSIS OF §3553(a) FACTORS

   A.  Nature & Circumstances of the Offense

As discussed above, Deramus was the head of a large-scale drug trafficking organization (DTO), wherein he obtained, cut, processed, and distributed large quantities of lethal mixtures of heroin, fentanyl, cocaine, xylazine, and other drugs—all combined in one. When he cut his drugs

too potently, he joked and laughed about how one of his testers may have overdosed and died and complained that it took his "licks" longer to come back and buy more. When CPD executed search warrants at one of his primary distributor's (Hurt's) stash house, Deramus simply demanded that Hurt return his drugs, settle his debt, and remain quiet, then turned around and sold those drugs to another distributor (Tribble). When CPD approached his dad about one of his prior homicide investigations, Deramus simply moved where he stored his drugs and kept on dealing. When CPD interviewed another witness about that homicide investigation, Deramus met with the witness for hours, then—again—kept on dealing drugs.

In short, Deramus was a ruthless, violent head of a large-scale DTO, who employed violence to ensure that he continued to profit off deadly drugs and crippling addiction—without any remorse for his actions. His sentence should reflect the grave seriousness of his crimes, which weighs heavily in favor of imposing a lengthy term of incarceration.

### B. History & Characteristics

The Defendant is 46 years old. His criminal history dates back to his early youth and includes several significant juvenile adjudications. (*See* PSR at ¶¶ 73-77.) Since turning eighteen, he has amassed a substantial criminal record that includes prior adult convictions for (among other things): trafficking heroin (2011, 2012 **x2**),[3] trafficking cocaine (2005), cocaine possession (1999 **x2**, 2002, 2005, 2009), aggravated drug trafficking (2023), fentanyl possession (2023), attempted possession of heroin and cocaine (2017), marijuana possession (1997, 1998, 1999, 2001, 2002 **x4**, 2003, 2005, 2008 **x2**, 2009, 2011 **x2**, 2015 **x3**, 2018, 2019, 2023), trafficking marijuana (2005), possession of drug paraphernalia (2002, 2023), theft (2009), criminal trespass (2002 **x2**),

---

[3] For his first heroin trafficking conviction in 2012, Deramus conducted four separate controlled buys of heroin and cocaine, all within 1,000 feet of a school. (PSR, ¶ 112.)

10

obstruction (1999,[4] 1999, 2002 **x2**), resisting arrest (2002, 2012), OVI (2012), driving under suspension (1999, 2002, 2011, 2012), failure to comply (2002), no driver's license (2002), and improper turn and failure to stop (2011), among numerous other minor convictions. Deramus also has two pending OVI charges, both from January 2024; as well as additional arrests on charges that were subsequently dismissed for (among other things): trafficking heroin (2011), trafficking fentanyl (2024), drug possession (1998), marijuana possession (1999, 2003, 2005, 2008, 2009), possession of drug paraphernalia (2023), robbery (1991), assault (1993, 1995), disorderly conduct (1996), and obstruction (1999, 2002, 2005), among others.

Moreover, Deramus has never been charged with homicide nor murder-for-hire.[5] Yet he is the primary suspect in at least six CPD cold case homicides and has been implicated in even more.

*Victoria Gibson*. On April 22, 2009, Victoria Gibson was murdered in her bedroom at 752 Chestnut Street, in the West End of Cincinnati. She was found half-naked, shot four times in the back, with her young children still clinging to her dead body. She was 31 years old. CPD has received conflicting reports about her murder. Some witnesses have said that her residence was one of Deramus' stash houses and she was killed by assailants trying to rob Deramus. Other witnesses have said that Deramus was the shooter and wore a wig to hide his identity.

*Jeffrey Davis*. On May 23, 2009, Jeffrey Davis was shot and killed in the same area of the West End, likely in retaliation for the murder of Victoria Gibson. He was 18 years old. In particular, while standing on Chestnut Street (*i.e.*, the same street at Victoria Gibson's residence), three individuals approached Davis and unloaded a revolver on him as he attempted to flee. CPD

---

[4] Law enforcement attempted to stop Deramus while investigating a weapons offense, but Deramus fled. (PSR, ¶ 80.)
[5] Congress has provided that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. "[T]his statute was enacted in order to clearly authorize the trial judge to rely upon information of alleged criminal activity for which the defendant had not been prosecuted." *United States v. Mayle*, 334 F.3d 552, 566 (6th Cir. 2003) (cleaned up) (relying on prior "uncharged criminal conduct," *e.g.*, two prior murders, under "history and characteristics" prong of 18 U.S.C. § 3553(a)).

11

later found Davis shot in the back, but still alive, in the parking lot of Ritche's Fast Food, around the corner on Linn Street. The only information Davis would provide before he died was that he was on Chestnut Street when the shooting occurred and that he knew the shooter. Multiple witnesses identified "K-Bone," *i.e.*, Deramus, as one of the individuals who approached Davis and stated that Deramus had Davis killed in retaliation for robbing and murdering Victoria Gibson.

*Terrence Newell*. On October 5, 2009, Terrence Newell, a/k/a "T-Money," was shot in the back several times during a drive-by shooting in the Northside. He was 29 years old. Witnesses said the shooter drove a Chevy Tahoe. (A few days prior, Deramus was seen driving a Chevy Tahoe.) Some witnesses identified Deramus and/or "K-Bone" as the shooter. And years later, another witness stated that Deramus wore a wig to murder "T-Money" in the Northside. As before, Newell was suspected of robbing a stash house used by Deramus and/or one of his dealers.

*Terrance Woods & Troy Smith*. On January 12, 2017, Terrance Woods was shot and killed, assassination style, with one gunshot wound to the back of the head, in a vacant construction site near Avondale/Evanston. He was 23 years old. A few hours later, around 4:00 AM on January 13, 2017, Troy Smith, a/k/a "T-Roc," was shot and killed, multiple times in the back of the head, inside his parked car on Chestnut Street in the West End. He was 32 years old.

The very next day, CPD received an anonymous call that Woods and Smith had been killed in retaliation for robbing the home of a dealer who dealt drugs for "K-Bone," *i.e.*, Deramus.[6] The anonymous caller further stated that, prior to the two murders, they heard "K-Bone" state that, "We got to make an example of these guys, can't keep letting them run up in people's houses."

---

[6] CPD searched found a home invasion burglary report from the mother of the dealer who sold drugs for Deramus. She reported that on January 10, 2017, four armed, masked men came into her house, demanded money and threatened her, and then used her cell phone to call her son (*i.e.*, Deramus' dealer).

12

In particular, for Terrance Woods' murder, CPD received a 911 call about how two vehicles—a black Dodge Charger and a black Honda Accord—had parked near the construction site, two males (presumably Woods and Deramus) exited the vehicles, walked between a set of buildings, the witness heard a gunshot, then saw one male return to the black Dodge Charger and quickly depart. CPD responded and found Woods lying dead, face down on the top of construction debris, with a single gunshot wound to the back of the head. In his pocket, Woods had lottery tickets he'd purchased earlier that morning from Amir Mini Mart in Findlay Market.

CPD later recovered surveillance footage from Amir Mini Mart, which showed Woods and Deramus arriving together in the same or similar black Dodge Charger, Woods going inside, then returning to the black Dodge Charger with Deramus and departing. CPD also recovered surveillance footage of the same or similar black Dodge Charger in the area of Woods' residence in the West End, earlier that morning. Moreover, historical cell site location showed that Deramus was driving around the West End at the time that Woods was picked up from his residence, Deramus was at Amir Mini Mart at the time Woods purchased the lottery tickets, and Deramus was at or near the murder scene around the same time that Woods was shot and killed. CPD also learned that Deramus borrowed the black Dodge Charger from a family friend, a few days prior, and then returned it the day after the homicides, reeking of bleach/cleaning supplies.

**_Rickey Lackey_**. Around 10:30 PM on June 6, 2019, Rickey Lackey was shot and killed, multiple times in the chest and head, near Bond Hill in Cincinnati. He was 37 years old.

Multiple witnesses put Lackey at a rap studio right before his death and stated that there was "money on his head." Another witness said that the night before, Lackey said that he was "scared" because he had "messed up K-Bone's [*i.e.* Deramus's] money" and owed him $100k. The same witness said that while they were at the rap studio, just before his death, Lackey received

13

a call from Deramus. Deramus said he wanted to see Lackey immediately. Lackey offered for Deramus to meet them at the rap studio but Deramus refused because he was "hot," *i.e.*, was in possession of a firearm. The witness later heard Deramus yelling at Lackey before hanging up. Lackey then stated that he had to leave to go meet Deramus, before abruptly departing around 9:00-9:30 PM. An hour later, Lackey was lying dead in street, with multiple gunshot wounds to his head and chest. Based on the cell phone found on his body, the last call Lackey received before being shot was from a contact saved in his phone as "Bown" (which agents believe is similar to "Bone" or "K-Bone," in reference to Deramus). In the two hours leading up to his death, there were 12 calls between Lackey and "Bown," including the last call Lackey ever received.

*Others*. Deramus has also been implicated in and/or investigated for either shooting or hiring the shooters in relation to the murder of: (1) 27-year-old Mark Williams Jr., on May 14, 2019 in the West End; (2) 26-year-old Damontae Gibson on November 7, 2019 in Westwood; and (3) 25-year-old Desmond Watson on November 29, 2019 in Downtown Cincinnati; among others.

### C. Seriousness of the Offense, Just Punishment, & Respect for the Law

For the same reasons as above, the United States believes that imposing a lengthy term of incarceration, at the very top of Deramus' guidelines, is also necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for his criminal conduct. Likewise, any remaining concerns the Court may have can be addressed by imposing a lengthy term of supervised release, such as life, which is the statutory maximum.

### D. Deterrence

Lastly, the United States believes that imposing a term of imprisonment at the very top of Deramus' guidelines, followed by a lengthy term of supervised release, if not life, would provide afford adequate deterrence to similar criminal conduct, both specifically for Deramus and the

general public.  A term of 327 months in prison would be the longest sentence Deramus has ever faced, which the United States believes would both sufficiently acknowledge his criminal conduct and adequately deter him from committing additional crimes in the future.  More importantly, a term of 327 months in prison would ensure that Deramus ceases to flood our streets with deadly addictive poison and violence. Meanwhile, imposing a lengthy term of imprisonment at or near the very top of his guidelines, followed by a lengthy term of imprisonment of preferably life, on top of that, would send a strong message to the community:  that distributing lethal combinations of heroin/fentanyl/cocaine/xylazine throughout our city—and shooting rivals who get in your way— will not be tolerated and will be prosecuted accordingly.

## CONCLUSION

Accordingly, the United States asks that the Court sentence Deramus to a term of 327 months in prison, followed by a lifetime term of supervised release.

Respectfully submitted,

DOMINICK S. GERACE II
United States Attorney


/s/ *David P. Dornette*
David P. Dornette (OH 0098903)
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served this 10th day of November 2025 electronically upon all parties of record.

/s/ David P. Dornette
David P. Dornette
Assistant United States Attorney
